AO 91 (Rev. 11/11) Criminal Complaint · · · · · · · · · · · · · · · · AUSA Tobara S. Richardson (312) 469-6305

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

SEP 05 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

KLINT KELLEY

CASE NUMBER:

**17CR    581**

**CRIMINAL COMPLAINT** MAGISTRATE JUDGE WEISMAN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

<u>Count One</u>

On or about April 3, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 922(a)(5)<br><br>**FILED**<br><br>SEP 05 2017<br><br>M. DAVID WEISMAN<br>MAGISTRATE JUDGE<br>UNITED STATES DISTRICT COURT | not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, willfully did sell a firearm, namely, a Ruger, Model GP100, .357 caliber revolver, serial number 176-72797, a Hi-Point, Model JCP, .40 caliber, serial number X7242830, a Hi-Point, Model C-9, 9mm semi-automatic pistol, serial number P1496090, a Taurus, Model PT738 TCP, .380 caliber semi-automatic pistol, serial number 21915C, a Smith & Wesson, Model Bodyguard, .380 caliber semi-automatic pistol, EBP9547, a Inter Ordnance, Model Sporter, 7.62 caliber semi-automatic rifle, serial number S009607, a Cugir Romania, Model WASR-10, 7.62 semi-automatic rifle, serial number A1-20884-14, and a Hi-Point, Model 4595, .45 caliber semi-automatic rifle, serial number R69022, to Individual A, said person not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that Individual A was not then residing in the State of Arkansas, the |

State in which defendant was residing at the time of the aforesaid sale of the firearm

Count Two

On or about April 3, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 922(d)(1) | did willfully sell a firearm, namely, a Ruger, Model GP100, .357 caliber revolver, serial number 176-72797, a Hi-Point, Model JCP, .40 caliber, serial number X7242830, a Hi-Point, Model C-9, 9mm semi-automatic pistol, serial number P1496090, a Taurus, Model PT738 TCP, .380 caliber semi-automatic pistol, serial number 21915C, a Smith & Wesson, Model Bodyguard, .380 caliber semi-automatic pistol, EBP9547, a Inter Ordnance, Model Sporter, 7.62 caliber semi-automatic rifle, serial number S009607, a Cugir Romania, Model WASR-10, 7.62 semi-automatic rifle, serial number A1-20884-14, and a Hi-Point, Model 4595, .45 caliber semi-automatic rifle, serial number R69022, to Individual A, knowing and with reasonable cause to believe that Individual A had been convicted of a crime punishable by imprisonment for a term exceeding one year |

Count Three

On or about July 3, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(5) | not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, willfully did sell a firearm, namely, a Remington Arms, Model RM380, .380 caliber semi-automatic pistol, serial number RM020190C, a Ruger, Model Mark III, .22 caliber semi-automatic pistol, serial number 275-24090; a Smith & Wesson, Model SW9VE, 9mm caliber semi-automatic pistol, serial number PDB3205, a Beretta, Model Px4 Storm, 9mm caliber semi-automatic pistol, serial number PX216988, and a Zastava, Model N-PAP DF, 7.62 caliber semi- |

automatic rifle, serial number NPDF006596, to Individual A, said person not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that Individual A was not then residing in the State of Arkansas, the State in which defendant was residing at the time of the aforesaid sale of the firearm

## Count Four

On or about September 3, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| Title 18, United States Code, Section 922(a)(5) | not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, willfully did sell a firearm, namely a JTS, Model M12AK .12 gauge semi-automatic shotgun, serial number EM1601902, a Smith & Wesson, Model M&P15, .556 semi-automatic rifle, serial number S235967, a Armalite, Model SPR Mod 1, .556 semi-automatic rifle, serial number MS 003006, a Century Arms, Model UC9, 9mm uzi-style semi-automatic rifle, serial number GMT04926, a DPMS Panther Arms, Model A15, .556 semi-automatic rifle, serial number PFH093109, an Anderson MFG, Model AM15, .223 caliber pistol, serial number 16116413, a Zastava, Model PAPM92PV, 7.62 caliber pistol, serial number M92PV027866, and a Hi-Point, Model C9, 9mm semi-automatic pistol, serial number P1548002, to Individual A, said person not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that Individual A was not then residing in the State of Arkansas, the State in which defendant was residing at the time of the aforesaid sale of the firearm |

This criminal complaint is based upon these facts:

   X    Continued on the attached sheet.

JESSICA M. SALLEY
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: September 5, 2017

City and state: Chicago, Illinois

*Judge's signature*

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## **AFFIDAVIT**

I, JESSICA M. SALLEY, being duly sworn, state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since approximately 2005. I am currently assigned to ATF's Strike Force, and my responsibilities include the investigation of firearm and narcotics offenses. I have participated in numerous controlled buys of firearms, and I also have experience in handling and debriefing confidential informants, executing search warrants, and conducting surveillance.

2.     This affidavit is submitted in support of a criminal complaint alleging that KLINT KELLEY has violated Title 18, United States Code, Sections 922(a)(5) and 922(d)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging KELLEY with unlawful selling of firearms to a felon and an out-of-state resident, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offenses alleged in the complaint.

3.     This affidavit is based on interviews of witnesses, my own observations and actions, information received from other law enforcement agents, my experience and training, and the experience of other agents.

## Background of the Investigation

4.     From on or about March 23, 2017, to the present, an ATF Confidential Informant ("CI")[1] has communicated with KELLEY to arrange multiple firearm purchases, as described in more detail below. First, on or about April 3, 2017, the CI purchased eight firearms from KELLEY, who traveled from in or around Arkansas to Illinois to deliver firearms to the CI in exchange for cash. Second, on or about July 3, 2017, the CI purchased five firearms from KELLEY, who traveled from in or around Arkansas to Illinois to deliver firearms to the CI in exchange for cash. Third, on or about September 3, 2017, the CI purchased eight firearms from KELLEY, who traveled from in or around Arkansas to Illinois to deliver firearms to the CI in exchange for cash.

5.     On August 10, 2017, the Chief Judge of the United States District Court for the Northern District of Illinois issued an order for historical cell site location information, along with prospective location information, for the cellular phone used by KELLEY ("Subject Phone 1"), for a period of 30 days.[2] According to

---

[1] The CI has three prior convictions for robbery, narcotics, and other offenses. The CI worked for ATF from approximately October 2013 to April 2014 and again since approximately September 2014. The CI has received approximately $50,726 in monetary compensation for his cooperation with the ATF, including approximately $3,000 for his assistance with this case. The CI's information has proven reliable and credible, and has been corroborated by controlled purchases/meetings and physical surveillance conducted by law enforcement officers.

[2] KELLEY used Subject Phone 1 for all of the communications with the CI listed in this affidavit, including both text messages and recorded calls. Affiant has heard KELLEY speak in person and listened to the recorded communications. The individual communicating with the CI via Subject Phone 1 appears to have the same voice as KELLEY. In addition, the area code for Subject Phone 1 is an Arkansas-based area code, and, as described below, KELLEY is known to reside in Arkansas.

the data provided by AT&T in response to that order, the general location of Subject Phone 1 is consistent with the phone traveling from Arkansas to Illinois on or about April 3, 2017, and July 3, 2017, and September 3, 2017.

6. The CI has known KELLEY for approximately 15 to 20 years and grew up in the same Illinois neighborhood with KELLEY. According to the CI, KELLEY knew the CI during the CI's 15-month sentence and 72-month sentence for felony offenses. According to the CI, KELLEY moved to Arkansas approximately 8 years ago.

7. The Arkansas Secretary of State has an address for KELLEY in Malvern, Arkansas.

8. According to the CI, for about the last five years, KELLEY has traveled from Arkansas to Illinois to deliver firearms to residents of Illinois. The CI learned this information from KELLEY on an occasion when KELLEY and the CI were both visiting KELLEY's family in Illinois. During one of those visits in or around March 2017, the CI told KELLEY that the CI might be interested in purchasing firearms from KELLEY. After this meeting, the ATF showed the CI an unmarked photograph of an individual, who the CI positively identified as KELLEY.

9. Neither KELLEY nor the CI have ever been granted a federal firearms license to deal firearms.

### KELLEY's Sale of Eight Firearms on April 3, 2017

10.     On or about March 23, 2017, the CI texted KELLEY asking for pictures and prices of the firearms for sale.

11.     On or about March 24, 2017, the CI texted KELLEY that the CI wanted to see what KELLEY had and that the CI wanted "anything and everything."[3]

12.     Then, the CI made an outgoing recorded phone call to KELLEY. The CI asked KELLEY when KELLEY was coming to Chicago. KELLEY indicated that he would be in Chicago within approximately two weeks. When discussing where KELLEY would stay when he traveled to Illinois, KELLEY named different locations in either Chicago or surrounding suburbs. KELLEY told the CI that he would send the CI "the picture," referring to a picture of the firearms. During the recorded phone call, KELLEY also indicated that he did not have the prices yet. In response to the CI asking KELLEY how many firearms KELLEY possessed, KELLEY stated, "three or four handguns, and I got two AK-47's, I got a mother fucking 45 ACP assault rifle."

---

[3] The language quoted from the recorded conversations throughout this affidavit are based on a preliminary review of the recorded conversations, and not on final transcripts. The summaries of the recorded conversations do not include all statements or topics covered during the course of the recorded conversations. At various points in the affidavit, I have included my interpretation of words and phrases used in the recorded conversations. I base my interpretations on information received from cooperating sources, the content and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents involved in this investigation.

13.　During that same recorded conversation, after discussing a local street gang and after KELLEY had indicated he had been battered when he was in Justice, Illinois, KELLEY stated, "That's half the fucking reason, I mean it ain't half the reason, but it's part of the reason I got the fuck out of there [Illinois] and came down here [Arkansas] cuz I, I wanted to get away from all that shit. I came down here and tried to fucking do it right. Then, I come down here, I started smoking weed, got kicked out of school, did all the same shit that I was doing up there, but I, this is where I would rather be. It's fucking laid back, country style, you know what I mean." The CI told KELLEY, "You're down there living the fucking dream." KELLEY responded, "Exactly, exactly." KELLEY indicated he would send the CI "that picture right now."

14.　Immediately following the phone conversation, on March 24, 2017, KELLEY texted the CI the picture below:



15.     The above photo depicts three handguns, three rifles, one revolver, and several magazines.

16.     The CI followed up by text and told KELLEY to let the CI know "what its going to take," meaning how much it would cost to purchase the firearms in the picture.

17.     On or about March 29, 2017, the CI texted KELLEY asking KELLEY to let the CI know when KELLEY would be coming so that the CI could book a room. KELLEY texted that he would be there Sunday, referring to April 2, 2017, and he had a place to stay. The CI texted inquiring of the cost "on the whole load," meaning the cost of all of the firearms in the picture. The CI made an outgoing recorded phone call to KELLEY. During the recorded phone call to KELLEY, the CI asked KELLEY if he had a number, referring to the price of the firearms. KELLEY indicated that he did not have a price and that he would add it up later and let the CI know. Less than two minutes later, KELLEY texted the CI, "We lookin at about 4500."

18.     On or about April 1, 2017, the CI received an incoming recorded call from KELLEY. KELLEY asked the CI where the CI would be the next night because KELLEY would be in Illinois the next night. The CI told KELLEY that KELLEY would have to wait until Monday, referring to April 3, 2017, to which KELLEY responded that Monday was okay. KELLEY told the CI that he had obtained "another one," referring to another firearm for the CI. The CI asked KELLEY whether KELLEY was going to sell everything that KELLEY sent in the

picture that KELLEY had sent to the CI. KELLEY responded affirmatively plus the firearm KELLEY had just obtained for the price of $4,750. KELLEY indicated that the new firearm he had just picked up was a .40 caliber. KELLEY explained, "it's a hi-point, but the mother fucker's clean."

19.    On or about April 2, 2017, the CI texted KELLEY that they would meet around noon. KELLEY indicated that he would be around Orland.

20.    On that same day, in the evening, the CI made an outgoing recorded phone call to KELLEY. The CI asked KELLEY where KELLEY was located. KELLEY indicated that he was driving to Chicago, nearing Kankakee, Illinois. The CI told KELLEY that KELLEY was near Pontiac and that the CI knew exactly where Pontiac Correctional Center was located in Illinois. The CI explained, "I fucking sat my ass in that fucking jail for a while." The CI went on to explain that all of Pontiac is segregation and that Pontiac is a disciplinary jail for the entire Illinois State Prison system. The CI talked about an individual who had been at Pontiac for approximately 30 years. KELLEY and the CI knew each other at the time that the CI served an approximately 15-month sentence at Pontiac Correctional Center.

21.    During that same recorded conversation, the CI asked KELLEY about the length of KELLEY's drive. KELLEY told the CI that KELLEY's drive was approximately 10 hours or 700 miles. The CI asked KELLEY whether KELLEY remembered a particular individual, and KELLEY indicated "after being gone for fucking 10 years, you forget half the people." KELLEY told the CI that KELLEY

did not know exactly where KELLEY would be once he reached Chicago. The call ended shortly thereafter.

22.     On or about April 3, 2017, the CI and KELLEY exchanged texts where KELLEY provided the address of "7760w almond Frankfort," and the CI indicated that he would be there at approximately 1 p.m.

23.     The CI met with law enforcement at a predetermined location. Affiant searched the CI for contraband, firearms, and money, and none was found. The CI and an undercover ATF agent ("UC") were both equipped with audio and video recording devices. ATF provided the CI with $4,750 in ATF buy money to purchase the firearms.

24.     The UC and the CI were surveilled in a UC vehicle to 7760 Almond Court, Frankfort, Illinois. The CI exited the UC vehicle and entered the residence. According to the CI and as seen on the video, KELLEY and KELLEY's uncle were inside the residence. KELLEY's face can be seen on the video. According to the CI, KELLEY had five handguns inside a bag. On the video, KELLEY can be heard saying words to the effect of, "those are the mags, naw I didn't have any [ ] shells to bring with 'em." The CI paid KELLEY $4,750 and, on the video, KELLEY can be seen counting money. The men discuss the firearms, and KELLEY can be heard on the video stating words to the effect of, "those are the mags. This [ ] uh. This mag goes to the uh to the other little uh 45 rifle or whatever here shit." In the video, the CI picks up a firearm and asks KELLEY whether the gun was a "380." KELLEY

responded affirmatively. Then, as seen on the video, KELLEY holds a plastic bag while the CI placed a towel containing the firearms inside of the bag.

25. Next, according to the CI, as observed by the UC, and as seen on the video, KELLEY and the CI exited the residence. As observed by the UC, the CI carried a plastic bag. The CI placed the plastic bag in the bed of the UC vehicle. The UC observed that the bag contained five handguns and firearm magazines.

26. Then, the CI went to a pickup truck, where KELLEY opened the passenger door and manipulated items behind the seat. According to the CI, KELLEY displayed three assault rifles to the CI, and KELLEY helped the CI remove the three assault rifles from behind the seat, wrapping them in a fleece blanket.

27. The CI took the assault rifles to the rear of the UC vehicle and placed them into a locked compartment that the UC opened. Due to their size, the UC helped the CI pack the assault rifles into the compartment.

28. KELLEY, the CI, and the UC gave farewells. The UC observed KELLEY return to the residence. The CI and the UC returned to the UC vehicle and departed.

29. The CI and the UC traveled in the UC vehicle to a predetermined location. Affiant searched the CI for contraband, firearms, and money, and none was found. From the UC vehicle, affiant recovered the following eight firearms: (1) Ruger, Model GP100, .357 caliber revolver, serial number 176-72797; (2) Hi-Point, Model JCP, .40 caliber, serial number X7242830; (3) Hi-Point, Model C-9, 9mm

semi-automatic pistol, serial number P1496090; (4) Taurus, Model PT738 TCP, .380 caliber semi-automatic pistol, serial number 21915C; (5) Smith & Wesson, Model Bodyguard, .380 caliber semi-automatic pistol, EBP9547; (6) Inter Ordnance, Model Sporter, 7.62 caliber semi-automatic rifle, serial number S009607; (7) Cugir Romania, Model WASR-10, 7.62 semi-automatic rifle, serial number A1-20884-14; and (8) Hi-Point, Model 4595, .45 caliber semi-automatic rifle, serial number R69022.

30.　Later that same day, KELLEY texted the CI, "Ima be comin back in july. Ima try n find ya more brother."

### KELLEY's Sale of Five Firearms on July 3, 2017

31.　On or about May 22, 2017, KELLEY called the CI, and during the recorded conversation, KELLEY informed the CI that he would be coming to Illinois on July Fourth and would have an AK-47, an Uzi, and some handguns with him. On that date, KELLEY texted the CI the following pictures:





32. The top photo above depicts an uzi-like firearm, and the bottom three photos above depict the same rifle.

33. In addition, on or about May 27, 2017, KELLEY texted the CI the two pictures below:

11



34.     The left photo depicts an uzi-like firearm, and the right photo depicts a rifle.

35.     On or about June 11, 2017, KELLEY confirmed through text that he would see the CI on "On the 4th."

36.     On or about June 18, 2017, KELLEY texted the CI, "There is a gun and knife show coming up next weekend I'm going to try to grab some things there as long as I don't have to put my name on anything I picked up a 9 last night Smith & Wesson I'm trying to get as many as I can and then I will let you know on some numbers right before I come up there I guess," and "Been trying to get my hands on some more a K's [AK-47s] but nobody's wanting to let go of them lol."

37.     On or about June 29, 2017, KELLEY texted the CI, "2 of them brand new in box. One never been shot," "Idk the ak been shot either," and "Gonna try n grab a AR15 for you too." On that same day, KELLEY called the CI and during the recorded call they discussed when KELLEY would be coming to Chicago. KELLEY indicated that his girlfriend would be with him. Therefore, once she got off work, they would travel to Chicago Saturday morning, referring to July 1, 2017. The CI told KELLEY he was waiting on "bread," referring to money, and the CI asked if they could meet on Monday, referring to July 3, 2017. KELLEY agreed. The CI then asked KELLEY "how much are we looking at, did you figure it out" referring to how much money KELLEY wanted in exchange for the firearms. KELLEY stated that he was thinking "3," meaning $3000, for the firearms KELLEY currently possessed, but it would be "4," meaning $4,000, if KELLEY obtained another AR rifle. The CI agreed. KELLEY indicated that he went to a gun and knife show, but it was not a good show. Thus, KELLEY stated he was not able to buy anything.

38.     On or about June 30, 2017, KELLEY texted the CI, "Got that AK with folding stock, smith n Wesson 9mm 15round clip Remington 380 Brand new ruger .22 Brand new beretta 9mm." The CI texted, "So how many pieces total and how much brother." KELLEY responded, "the ak and 4 hand guns," "Ima try n grab an ar15 in the morning to," "3,000 without Ar15 4,000 if i can get it," and "You want em for sure? I got other people beggin for em but I been blowin em off." The CI responded, "Man stop playing I want everything," and "Keep blowing em off I want em my brother." KELLEY texted, "I gotcha. I told em maybe next time. I gotcha bro.

I aint bullshittin tho. All the mfs i used to deal wit still hit me up." The CI wrote back, "FUCK them… how long I been knowing u kid???? Too long.. And I got more money then any of them u can bet ur a as on that." KELLEY replied, "I got you brother."

39.     On or about July 1, 2017, KELLEY sent a message with a picture stating, "This all I could get my hand on brother. Unless something pops up between now saturday morning."



40.     The above photo depicts four handguns and one rifle.

41.     Then, the CI texted KELLEY, "Ill come see you monday," referring to July 3, 2017.

42.     On or about July 1, 2017, at approximately 11:45 p.m., the CI texted KELLEY, "you all good brother." KELLEY sent a text stating, "Yes sir comin up on Joliet. Long [ ] drive man." The CI responded, "Good deal ill see ya Monday early ….you got any idea where imma come see u." Just after midnight, KELLEY responded "Prolly close to oaklawn somewhere."

43. On or about July 3, 2017, KELLEY sent a text asking the CI, "Whats good brother." The CI responded, "hey brother...I can come see ya at about 10-11....where am I going?" KELLEY responded, "Idk yet. I planned on being downtown by then with my ole lady. Can we meet any sooner?" Through text, the CI indicated that he would be able to meet KELLEY at 11 a.m. KELLEY responded that he wanted to be downtown by that time because his girlfriend had never been to Chicago. The CI then suggested that they meet at approximately 11:15 a.m. at the United Center, to which KELLEY agreed.

44. At approximately 10:08 a.m., the CI called KELLEY. During the recorded call, KELLEY wanted to know the CI's location. KELLEY stated that he was in Oak Lawn, Illinois, and KELLEY could meet the CI closer to the CI's location. The CI told KELLEY that he was up north and could meet KELLEY at the United Center in Chicago.

45. At approximately 10:11 a.m., the CI called KELLEY, and during the recorded conversation, KELLEY told the CI that KELLEY was about to get on I-55 and would arrive prior to the CI at the meet location. At approximately 10:32 a.m., the CI called KELLEY and during the recorded conversation, the CI told KELLEY that the CI would be at the meet location in approximately 10 minutes. KELLEY indicated that he would probably arrive around the same time as he was currently near McCormick Place. At approximately 10:47 a.m., the CI received a call from KELLEY, and during the recorded call, KELLEY asked where the CI was located and that KELLEY was parked at the United Center near Monroe Street. At

approximately 10:54 a.m., the CI received a call from KELLEY, and during the recorded conversation, KELLEY told the CI that someone told KELLEY that he could not park where he had parked. KELLEY told the CI that he was moving to another location.

46.     The morning of July 3, 2017, the CI met with law enforcement at a predetermined location. Affiant searched the CI for contraband, firearms, and money, and none was found. ATF equipped the CI with an audio and video recording device, and ATF further provided the CI with $3,000. Affiant served in an undercover capacity and drove the CI to the United Center in a UC vehicle.

47.     The CI and Affiant were surveilled to the United Center in Chicago, Illinois. KELLEY stood outside of a blue Kia with KELLEY's girlfriend. As seen on the video, the CI exited the UC vehicle and met with KELLEY. KELLEY introduced his girlfriend to the CI. Affiant observed the CI hand KELLEY the money, and KELLEY showed the CI that the firearms were in the trunk of the blue Kia. As heard on the recording, KELLEY said, "They're like new in fucking boxes." The CI asked KELLEY, "It's a total of five, right?" KELLEY responded, "Yea." As captured on the UC vehicle's recording device, the CI and KELLEY carried the firearms to the UC vehicle and placed them into the bed of the UC vehicle. The CI returned to the UC vehicle and departed in the UC vehicle with Affiant.

48.     The CI and Affiant traveled in the UC vehicle to a predetermined location. ATF agents searched the CI for contraband, firearms, and money, and none was found. From the UC vehicle, the following five firearms were recovered:

(1) Remington Arms, Model RM380, .380 caliber semi-automatic pistol, serial number RM020190C; (2) Ruger, Model Mark III, .22 caliber semi-automatic pistol, serial number 275-24090; (3) Smith & Wesson, Model SW9VE, 9mm caliber semi-automatic pistol, serial number PDB3205; (4) Beretta, Model Px4 Storm, 9mm caliber semi-automatic pistol, serial number PX216988; and (5) Zastava, Model N-PAP DF, 7.62 caliber semi-automatic rifle, serial number NPDF006596.

### KELLEY's Sale of Eight Firearms on September 3, 2017

49.     On or about July 18, 2017, KELLEY texted the CI, "Whats good brother." The CI responded, "Waiting on you my brother....I'm ready when you are." KELLEY texted, "Man it might happen within a few weeks," and "Big toys this time." The CI responded, "Bring it on I'm ready," and "Pics????" KELLEY texted, "Ill get you a pic in a bit. Ak shotty. 3Ar15s and Ak47 pistol. All nice [ ] like new." The CI responded, "I want it all....just figure out what u want we will work it out....ready when u are my brother." KELLEY texted, "Okni gotcha. Prolly be a couple weeks but ima make the trip for ya. Drive crash n drive home. Cant take any more time off of work." That evening, KELLEY sent the CI a message "Boy we going inn next round" with the picture below:



50.     The above photo appears to depict four long firearms and two possible handguns.

51.     On or about August 2, 2017, KELLEY texted the CI indicating that he would be traveling to Illinois within a few weeks and that he "picked up another ar15."

52.     On or about August 13, 2017, KELLEY texted the CI "Ima be up there labor day," and "First weekend of September."

53.     On or about August 24, 2017, KELLEY texted the CI "I'm going to make a run up there next weekend."

54.     On or about August 25, 2017, KELLEY texted the CI "This is what I got for you bro a pistol grip AK-47 4 AR-15s the uzi the semi automatic AK shotgun and a 9mm." On that date, KELLEY texted the CI the following picture:



55. The above photo appears to depict four long firearms, one uzi-style firearm, and three possible handguns or pistols.

56. On that same date, KELLEY confirmed by text message, "Yeah brother 8 pieces," referring to 8 firearms. With regard to pricing, KELLEY texted the CI, "I'm looking at 7 G's [$7,000] altogether if you're good with that I'm just throwing that little pistol in there cuz we Boyz." KELLEY also texted the CI, "You can probably pop the AR off for 13 apiece easy the ones and ArmaLite everything here is like brand new." KELLEY texted the CI, "I'm going to be up there next Saturday night you going to be ready for me." The CI responded by text, "Oh trust me ima get a pretty penny for em."

57. On that same date, the CI asked KELLEY, "so what are you thinking, you said seven," referring to $7,000 for the firearms. KELLEY confirmed the price. The CI then talked about how he could sell "the ARs" for "15 a pop," referring to selling the AR-15s for $1,500 each. The CI stated, "The K by itself, I'll get somebody for 15," meaning that the AK would sell for approximately $1,500. KELLEY said, "I know it don't mean fuck to you, but these all came from a dude that told me they came from an old man and they're not even hot. I mean, they're all supposed to be legit. Not that that makes a fuck in the hands of whoever they end up in, you know what I mean." KELLEY went on, "But dude, I mean these things are all brand fucking new, barely been fucking shot dude." KELLEY explained, "The one that's got the fucking camo, you know, for the deer hunting fucking cock suckers down here, that motherfuckers like $1,500 by itself cuz it's an armor light, but I mean dude they're all like fucking brand new." The CI asked KELLEY, "you said Saturday night?" KELLEY confirmed. The CI indicated to KELLEY that he would have all of the money by then and that the CI had $5,000 at that time. KELLEY indicated that he was coming "up there" Labor Day weekend. KELLEY explained that he was driving to Illinois Saturday, going to stay overnight to see his family Sunday, and then Monday he would drive back to Arkansas. The CI said that he would be able to meet with KELLEY Sunday. KELLEY told the CI that KELLEY was going to keep his "eyes peeled, uh as soon as I come back home I'ma try to grab you some more for the next round."

58. On or about August 30, 2017, the CI texted KELLEY, "If you get in saturday night? think i can see you early sunday morning." The CI texted KELLEY a location and approximate time for them to meet. KELLEY texted, "I'm thinking about driving halfway Friday so I will probably be up there Saturday afternoon." The CI texted KELLEY that Sunday would be better, to which KELLEY agreed.

59. On or about August 31, 2017, KELLEY texted the CI, "You want everything I got right?" The CI texted, "Yes sir cash in hand as usual my brother." KELLEY texted, "Ok brother, Jw other mfs hitting me up like always." The CI texted KELLEY, "Yea ill take em all brother 7grand."

60. On or about September 2, 2017, KELLEY confirmed by text message that he had reached Illinois.

61. The morning of September 3, 2017, the CI met with law enforcement at a predetermined location. An ATF Agent searched the CI for contraband, firearms, and money, and none was found. ATF equipped the CI with an audio and video recording device, and ATF further provided the CI with $7,000. An ATF Agent served in an undercover capacity and drove the CI to a commercial location in Chicago Ridge, Illinois, in a UC vehicle.

62. The CI and the UC were surveilled to the commercial location in Chicago Ridge, Illinois. KELLEY exited a blue Kia while KELLEY's girlfriend remained inside of the vehicle. The CI exited the UC vehicle and met with KELLEY. KELLEY and the CI removed the firearms from the trunk of the blue Kia. Then, KELLEY and the CI took the eight firearms to the back of the UC

vehicle and placed them into the bed of the UC vehicle. The CI handed KELLEY the $7,000, and KELLEY gave it to KELLEY's girlfriend to count.

63.     The CI was transported back to a predetermined location. ATF agents searched the CI for contraband, firearms, and money, and none was found. From the UC vehicle, the following eight firearms were recovered: (1) JTS, Model M12AK .12 gauge semi-automatic shotgun, serial number EM1601902; (2) Smith & Wesson, Model M&P15, .556 semi-automatic rifle, serial number S235967; (3) Armalite, Model SPR Mod 1, .556 semi-automatic rifle, serial number MS 003006; (4) Century Arms, Model UC9, 9mm uzi-style semi-automatic rifle, serial number GMT04926; (5) DPMS Panther Arms, Model A15, .556 semi-automatic rifle, serial number PFH093109; (6) Anderson MFG, Model AM15, .223 caliber pistol, serial number 16116413; (7) Zastava, Model PAPM92PV, 7.62 caliber pistol, serial number M92PV027866; and (8) Hi-Point, Model C9, 9mm semi-automatic pistol, serial number P1548002.

64.     KELLEY was arrested on scene and transported to ATF offices. In a recorded interview, KELLEY was provided his *Miranda* rights, waived them in writing, and agreed to talk to ATF agents. During the interview, KELLEY admitted to obtaining firearms in or around Arkansas and travelling to Illinois to sell the firearms to the CI, who KELLEY knew was an Illinois resident. KELLEY admitted to transporting and selling the firearms to the CI on three occasions. KELLEY also admitted that he was not a licensed firearms dealer.

## CONCLUSION

65.    Based upon the foregoing facts, I respectfully submit that there is probable cause to believe that on or about April 3, 2017, July 3, 2017, and September 3, 2017, defendant KLINT KELLEY, not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, willfully did sell a firearm to Individual A, said person not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that Individual A was not then residing in the State of Arkansas, the State in which defendant was residing at the time of the aforesaid sale of the firearm.

66.    Based upon the foregoing facts, I also respectfully submit that there is probable cause to believe that on or about April 3, 2017, defendant KLINT KELLEY did willfully sell a firearm to Individual A, knowing and with reasonable cause to believe that Individual A had been convicted of a crime punishable by imprisonment for a term exceeding one year.

FURTHER AFFIANT SAYETH NOT.

_____
JESSICA M. SALLEY
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on September 5, 2017.

_____
M. DAVID WEISMAN
United States Magistrate Judge

24